UNITED STATES of America, Appellee,

v.

Larry Lee HANSEL, Appellant.

No. 72-1373.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 5, 1972.

Decided Feb. 20, 1973.

Douglas McArthur, Lincoln, Neb., filed brief for appellant.

William K. Schaphorst, U. S. Atty., and R. C. Cougill, Asst. U. S. Atty., Omaha, Neb., filed brief for appellee.

Before MATTHES, Chief Judge, and GIBSON and HEANEY, Circuit Judges.

HEANEY, Circuit Judge.

The defendant was convicted on two counts of violating the Gun Control Act of 1968. Count I charged that, in violation of 18 U.S.C. §§ 922(a)(6) and 924(a), he had falsely certified that he had not been adjudicated a mental defective or committed to a mental institution. Count II charged that, in violation of 18 U.S.C. §§ 922(h) and 924(a), the defendant had received a firearm after having been adjudicated a mental defective or committed to a mental institution.

The evidence clearly showed that the defendant had purchased a firearm on April 25, 1971, and had stated on the "Firearms Transaction Record" that he had not been adjudicated mentally defective or committed to a mental institution. The principal question before the trial court and before this Court is whether the defendant had in fact been "adjudicated as a mental defective" and "committed to any mental institution" within the meaning of § 922(h) of the Gun Control Act of 1968.[1]

---

1. 18 U.S.C. § 922(h) states:
   "(h) It shall be unlawful for any person—
   "(1) who is under indictment for, or who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;
   "(2) who is a fugitive from justice;
   "(3) who is an unlawful user of or addicted to marihuana or any depressant or stimulant drug (as defined in section 201(v) of the Federal Food, Drug, and Cosmetic Act) or narcotic drug (as defined in section 4731(a) of the Internal Revenue Code of 1954); or
   "(4) who has been adjudicated as a mental defective or who has been committed to any mental institution;
   "to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

According to the evidence produced by the government, the Board of Mental Health of Lancaster County, Nebraska, found the defendant to be mentally ill and in need of hospitalization and ordered him hospitalized pursuant to 5 Neb.Rev.Stat. § 83–328 (1971). It was the position of the government that the finding of the mental illness constituted an adjudication of mental defectiveness, and that the order of hospitalization constituted a commitment.

During the government's case, the doctor who had examined the · defendant upon his admission to Lincoln State Hospital testified. He stated that the defendant was found not to have a serious mental disorder, and that he was not in need of hospitalization. He also stated that the defendant was not a mental defective.

The evidence showed that the defendant was released from the hospital on "convalescent leave" after two weeks, and was shortly thereafter formally discharged. Subsequent to his release, the defendant had no further contacts with the hospital.

At the close of the government's case, the defendant moved for a directed verdict on the grounds that there was no evidence to show that he had either been adjudicated a mental defective or committed to a mental institution. This motion was denied.

The defendant then presented his case. The defendant testified that he did not believe that his entry into the Lincoln State Hospital constituted a "commitment." He stated that he had been told that it was solely for a brief period of observation. This testimony was corroborated in part by the defendant's wife.[2]

At the close of the case, the court instructed the jury that they could find the defendant guilty if he had either been adjudicated a mental defective *or* if he had been committed to a mental institution. The court then defined a mental defective as a "person who has any abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls." The court did not further define the term "commitment." The defendant objected, stating that he did not believe the question of whether the defendant was a mental defective should go to the jury because no evidence had been introduced in that regard. The judge overruled this objection.[3]

The first question is whether the defendant's hospitalization, pursuant to the County Mental Health Board's order, was a "commitment." The government conceded on appeal that the defendant was not committed because there was no compliance with 5 Neb.Rev.Stat. § 83–328.[4] This concession is well taken.

---

2. The defendant's wife stated that it was her understanding that the defendant had been hospitalized for observation.

3. The jury returned a general verdict of guilty on both counts. It made no special finding that the defendant had been "committed to any mental institution" or "adjudicated a mental defective." Under such circumstances, we must examine the record to determine whether there is evidence to support both. For the reasons set forth in the opinion, we feel that there is not sufficient evidence to support either.

4. 5 Neb.Rev.Stat. § 83–328 (1971) states: "*83–328. County board of mental health; certification from superintendent; findings.* As soon as practicable after the certificate required by this act has been filed, the county board of mental health shall conclude its investigations. The board members shall find (1) whether the person alleged to be mentally ill is mentally ill; (2) if mentally ill, whether he should be admitted to a state hospital for the mentally ill; and (3) whether his legal settlement is in their county, and if not in that county where it is, if ascertained. If they find the person alleged to be mentally ill is not mentally ill, the board members shall order his discharge, if he is in custody; if they find the person alleged to be mentally ill is mentally ill and should be admitted to a hospital, they shall issue a warrant in duplicate, stating their finding together with the legal settlement of the proposed patient if found and if not found their information if any in regard thereto, authorizing the superintendent of the

The Nebraska statutory scheme establishes a two-step procedure for determining that an individual is a mentally ill person in need of hospitalization. First, the individual may be temporarily hospitalized for psychiatric observation if the County Mental Health Board makes a determination that he is a mentally ill person in need of hospitalization. Second, an individual may be *committed* to a hospital if, on the basis of this observation, the superintendent of the state mental hospital determines that the individual is mentally ill and then certifies this determination to the County Board of Mental Health.

In the present case, no evidence was introduced to establish that the superintendent of the mental hospital had determined the defendant was mentally ill or had conveyed any certification to the Mental Health Board. The record rather indicates that the defendant was found by the superintendent to have no serious mental illness, and was found not in need of hospitalization. Thus, the scope of the Mental Health Board's order hospitalizing the defendant was limited to "authorizing the superintendent of the hospital to receive and keep the person as a patient for a period of *observation*, not to exceed sixty days * * *." (Emphasis added.). 5 Neb.Rev.Stat. § 83–328. There is nothing in 18 U.S.C. § 922(h) which indicates an intent to prohibit the possession of firearms by persons who had been hospitalized for observation and examination, where they were found not to be mentally ill. The statute makes it clear that a commitment is required.

■ The second question is whether the finding by the Mental Health Board, that the defendant was mentally ill, was an adjudication of mental defectiveness within the meaning of 18 U.S.C. § 922 (h). We hold that it was not. We do not reach the question of whether the "finding" was an "adjudication" because we believe that the term "mental defective" as used in the Gun Control Act does not include mental illness.

The Gun Control Act itself does not define the term "mental defective." The parties have not suggested any legislative history which would illuminate this point, and we have found nothing in the committee reports or debates which is helpful.

■ Thus, we are left to ourselves to determine the meaning of the term "mental defective," " * * * without any revealing guides as to the intent of Congress. In these circumstances we should follow the familiar rule that criminal statutes are to be strictly construed and give to '[mental defective]' its narrow meaning * * *." Yates v. United States, 354 U.S. 298, 310, 77 S.Ct. 1064, 1072, 1 L.Ed.2d 1356 (1957).

At trial, the following colloquy took place between the defendant's counsel and the doctor who had examined the defendant at the state mental hospital:

"Q. Dr. Richardson, are you familiar with the term mentally defective, or mental defective?

"A. I think that I would know what is generally meant by mental defective, yes.

"Q. What is your understanding of the term mental defective?

"A. My understanding of the term would be an impairment of intellectual abilities so it would be synonymous with mental retardation. This would be my understanding of the term.

"Q. Dr. Richardson, based upon your training and based upon your examinations of Larry Hansel do you have an opinion as to whether or not Mr. Hansel would be classified as a mental defective?

hospital to receive and keep the person as a patient for a period of observation not to exceed sixty days, at which time the hospital superintendent shall certify that the patient is or is not mentally ill. Commitment by the county

board of mental health will be completed only when certification from the superintendent of the state hospital concerned is properly filed with the referring county board of mental health."

"A. No, he would not.

"Q. He would not be classified as a mental defective?

"A. In my opinion he would not."

No testimony to the contrary was introduced.

■ In law, a distinction has usually been made between those persons who are mentally defective or deficient on the one hand, and those who are mentally diseased or ill on the other. See, People v. Thayer, 121 Misc. 745, 202 N.Y.S. 633 (Ulster County Ct. 1923); Interstate Compact on Mental Health, 5A Ark.Stat.Ann. § 59–801; Herzog, Medical Jurisprudence, §§ 561–585 (1931); 1 Wharton and Stille, Medical Jurisprudence, §§ 1073–1093 (5th ed. 1905). In its plain meaning, the term "mental defective," as Dr. Richardson testified, normally designates an individual of marked subnormal intelligence. People v. Hoffmann, 255 App.Div. 404, 8 N.Y.S. 2d 83, 85 (App.Div.1938). In that case, the court stated:

"* * * The statutes do not define 'mental defect,' 'mental defective,' nor 'mental deficiency;' but Webster's Dictionary (1935 edition) denominates these as 'marked subnormal intelligence,' 'lack of intelligence,' and that in varying degrees of the descending scale of moronity, imbecility and idiocy. * * *"

Similarly, a psychiatric dictionary defines "mental defective" as "one who is subnormal intellectually, feebleminded." L. Hinsie & R. Campbell, Psychiatric Dictionary (1960). The Encyclopedia Britannica states that mental defectiveness, mental deficiency and feeblemindedness are synonyms which denote limitations of development of the personality, usually including intellectual retardation. 15 Encyclopedia Britannica 167 (1972). The Royal Commission on Capital Punishment (1953) has stated:

"336. 'Mental deficiency' is generally understood as meaning intellectual defect, or defect of understanding, existing from birth or from an early age. In England 'mental defectiveness' is defined by statute as 'a condition of arrested or incomplete development of mind existing before the age of eighteen years, whether arising from inherent causes or induced by disease or injury'.[9]

9. Mental Deficiency Act, 1927 Section 1(2).

A mental defective, therefore, as has often been said, is a person who has never possessed a normal degree of intellectual capacity, whereas in an insane person faculties which were originally normal have been impaired by mental disease.

"337. In England mental defectives are divided into four classes, which are defined as follows:—

"'(a) Idiots, that is to say, persons in whose case there exists mental defectiveness of such a degree that they are unable to guard themselves against common physical dangers;

"'(b) Imbeciles, that is to say, persons in whose case there exists mental defectiveness which, though not amounting to idiocy, is yet so pronounced that they are incapable of managing themselves or their affairs or, in the case of children, of being taught to do so;

"'(c) Feeble-minded persons, that is to say, persons in whose case there exists mental defectiveness which, though not amounting to imbecility, is yet so pronounced that they require care, supervision and control for their own protection or for the protection of others or, in the case of children, that they appear to be permanently incapable by reason of such defectiveness of receiving proper benefit from the instruction in ordinary schools;

"'(d) Moral defectives, that is to say, persons in whose case there exists mental defectiveness coupled with strongly vicious or criminal propensities and who require care, supervision and control for the protection of others.'"

We recognize that the term "mental defective" has on occasion, been given a more expansive meaning by courts and legislatures. See, United States v. Flores-Rodriguez, 237 F.2d 405, 411 (2nd Cir. 1956). But as we have said, we must construe the statute narrowly and give to "mental defective" its general meaning. If it is the desire of Congress to prohibit persons who have any history of mental illness from possessing guns, it can pass legislation to that effect, but we cannot read into this criminal statute an intent to do so. We can speculate that Congress desired to keep guns from all who had a history of mental illness and we might agree that such a policy would be desirable; but we can find no support for such a holding on our part.[5] We, therefore, hold that the defendant's convictions must be set aside and a judgment of acquittal entered on both counts.

Reversed.